Moriarty, Cornelius J., J.
INTRODUCTION
This matter came on for a jury-waived trial on claims of violations of G.L.c. 93A and G.L.c. 176D. The plaintiff claims that the defendant, Commerce Insurance Company (Commerce), failed to conduct a prompt and reasonable investigation of his claim and failed to make a fair and equitable offer of settlement once liability had become reasonably clear. Based on the credible evidence, the following facts are found.
BACKGROUND
This case stems from a motor vehicle accident which took place on August 13, 2003. The plaintiff Efrain Martinez Rivera (Rivera), then 34 years of age, *475 was the operator of an automobile which was struck by a dump truck operated by Edward Mutti (Mutti). Mutti had a policy of insurance with Commerce with policy limits of $1,000,000.00. The plaintiffs filed suit against Mutti in the Superior Court in August, alleging personal injuries and a loss of consortium. They later amended the suit to add the claims against Commerce for violations of G.L.c. 176D and M.L.c. 93A in 2007. Those claims were severed and stayed from the underlying suit. In May 2008, the tort claim against Mutti was settled for the policy limits.
FACTS
At the time of the accident Rivera was married and the father of three children. He was employed as a laborer at Old Colony Envelope where he earned $616.00 per week and from where he was returning at the time of the accident.
The collision was caused by Mutti’s dump truck crossing the center line of the roadway, traveling into Rivera’s lane of travel and striking Rivera’s automobile head on. Rivera was taken by ambulance to the Baystate Medical Center where he was treated and released.
In August 2003, Commerce received a letter of representation from Attorney Ryan Alekman (Alek-man) on behalf of Rivera. Commerce conducted an investigation into the cause of the accident and by August 22, 2003, determined that the accident was solely the fault of Mutti. Commerce was then aware that Rivera would likely pursue a claim for personal injuries.
Contact between Commerce and Alekman was initially sporadic. In January 2004, Alekman advised Commerce that Rivera was still treating for his injuries. In February 2004, after a failed course of physical therapy, he was referred to Dr. Richard Anderson, a neurosurgeon. A CT scan demonstrated a disc herniation at L 4-5. He then underwent a left L5-S1 decom-pressive hemilaminotomy, disc space exploration and lateral recess decompression on May 3, 2004. During the course of this procedure Dr Anderson noted a compressed conjoined nerve root.
The operation did not relieve Rivera’s pain. In January 2005, Alekman advised Commerce that Rivera was still out of work. Later, in May 2005, Alekman forwarded medical bills and records to Commerce referencing the prior surgery. Commerce increased its reserves to $200,000.00.
In July 2005, Alekman called Commerce and advised that Rivera remained out of work and, on some days, spent the entire day in bed. Commerce then decided to undertake surveillance. The surveillance reports indicated that Rivera was observed walking and driving without any difficulty.
During this period Rivera continued to treat with a host of different medical providers who provided different forms of treatment without success.
In the summer of 2005, Commerce Claims Examiner, Janice Jankowski (Jankowski) noted that Rivera was wearing a waist support at the time of the accident. She questioned whether this was due to work requirements or a pre-existing injury. Noting that the medical records indicated that Rivera had previously treated at Northgate Medical Center, she requested that the medical records be obtained from that facility.
In September 2005, Commerce adjuster Marc Rischetelli wrote to Alekman requesting additional medical information. Alekman responded that his client would be undergoing a second surgery in November 2005. Shortly thereafter Dr. Anderson performed a second procedure described as an anterior lumbar interbody fusion.
In March 2006, Commerce received a health care lien asserting a lien in excess of $44,000.00. Attached to the lien was a list of medical bills totaling over $154,000.00. As a result the reserves were increased to $500,000.00.
Rivera saw Dr. Anderson post-operatively who noted his complaints of persistent pain and left leg weakness. Dr. Anderson last treated Rivera in June 2006, at which time he recommended a referral to another physician for implantation of a dorsal column simulator in order to provide Rivera some relief.
In July 2006, Alekman spoke with an adjuster at Commerce and stated that he was preparing to file suit due to the statute of limitations. In August, Commerce learned that the complaint had been filed but not yet served. At the time Alekman stated that the demand would be for the policy limits of $1,000,000.00.
On August 21, 2006 Commerce assigned the file to adjuster Michael Hall (Hall). Hall handled the underlying case until it settled in 2008. When Hall took over the investigation, one of the first things he did was to review the liability investigation. He determined that Mutti’s liability was clear. As part of his initial review, he also reviewed surveillance tapes.
By October 2006, Commerce had referred the matter to Attorney Stephen Anderson for defense of the claim. Attorney Anderson authored a “Litigation Analysis Report” in which he noted that liability appeared to rest with the insured and that the discovery deadline was June 3, 2007.
In December 2006, Rivera underwent implantation of a spinal cord simulator at the Baystate Hospital Pain Clinic.
Early in December 2006, Hall received additional medical bills and records from Alekman. On December 19, 2006, after confirming that Mutti did not have an umbrella policy, Alekman told Hall that he would settle for the policy limits. Hall responded that he had just received a large packet of materials and that his valuation was not yet complete. Alekman informed Hall of the spinal cord stimulator procedure and that *476 Rivera’s medical bills now totaled in excess of $250,000.00.
Hall was aware at the time he took over the file that Rivera had claimed back and left leg injures and had undergone two surgeries. Hall also knew that Rivera was earning approximately $32,000.00 a year before the accident and had been out of work for well in excess of three years.
In January, Hall spoke to Alekman and told him he was declining to make an offer of settlement because he had concerns as to causation and intended to request an opinion from an expert. By that time Commerce had also decided to conduct additional surveillance of Rivera.
Limited surveillance in January 2007 revealed Rivera carrying two 2’ x 4’ pieces of lumber for a short period of time with no restrictions or visible disability. Based on this surveillance tape, Hall unilaterally decided that Rivera was capable of working. Hall is a high school graduate and is presently working towards his college degree. He also has experience as a claims adjuster. However, he has no demonstrable expertise in vocational assessment or training and accordingly his opinion founders.
Hall, like Jankowski, noted that Rivera arrived at the emergency room after the accident wearing a waist support. Although Jankowski suggested inquiry be made of Alekman to determine if the support was a work requirement or necessitated by a prior back condition, Hall decided not to do so. Instead, Hall decided to keep this information close to the vest and spring it upon Dr. Anderson during cross examination at trial.
In January 2007, Hall sent a medical record package for a record review to orthopedic surgeon Dr. Scott Cowan (Cowan). On February 9, 2007, Hall received a report authored by Cowan. Cowan noted that Rivera suffered a number of injuries from the accident. He opined that Rivera’s knee injury, which he related to the accident, would resolve in six weeks time, and that the contusions and strain injuries Rivera received about the neck and shoulders would also resolve spontaneously. Cowan also noted that Rivera had suffered a significant lumbar spine injury and that the disc herniation, with nerve root impingement, was secondary to the accident. Accordingly, he opined that the microdiskectomy performed by Dr. Anderson in May 2004 was caused by the accident.
Cowan did not relate the fusion surgery performed in November 2005 to the accident finding that it was due to degenerative disc disease, but noted that Rivera’s degenerative disc was atraumatic, i.e., not causing injury, prior to the accident.
He further opined that Rivera had a 13% whole body impairment, was at maximum medical improvement, and that the medical treatment was reasonable and necessary. After Cowan’s report was received, Hall forwarded it to Attorney Anderson and recommended the reserves be raised to $1,000,000.00.
On February 28, 2007, Attorney Anderson wrote to Hall commenting upon his review of the Northgate Medical records where Rivera had treated in March 2003. The records indicated that Rivera had complained to his doctor of back pain of three-to-four days duration from an injury. He was seen a short time later complaining of back pain of two-to-three months duration. At that time he was given a prescription for Motrin and referred to physical therapy.
Attorney Anderson also noted that Rivera was later seen at Northgate in April and May 2003, but during those visits did not complain of back pain and that he was not seen at Northgate again until after the accident. Anderson requested that Hall send the Northgate records to Cowan to determine if they changed his opinion.
Hall did not heed Attorney Anderson’s request with respect to the issue of causation but instead sought clarification from Cowan as to what portion of the 13% disability was due to the motor vehicle accident or degenerative disc disease. In response, Cowan issued a March 8, 2007 addendum apportioning 50% to the accident and 50% to the disease.
Hall conducted a further review of the file in which he reviewed the bills which then totaled $168,000.00 and noted that Dr. Anderson opined that Rivera was permanently disabled from working.
Hall did not send the Northgate records to Cowan as requested by Attorney Anderson. Instead he sought clarification as to whether the conjoined nerve root was due to genetic malformation or occurred as a result of trauma. In response, Cowan issued a second addendum indicating that the conjoined nerve root was genetic and not the result of trauma.
On April 3, 2007, Hall spoke with Alekman and told him that no offer would be made at that time because liability for the injury was not clear.
On April 9, 2007, Attorney Anderson sent a letter to Hall in which he commented that it was clear that Rivera has sustained a substantial back injury and had undergone three surgeries which his doctors had indicated were reasonable and necessary. He also raised a red flag concerning the usefulness of Cowan’s report. He again asked Hall to send the Northgate records to Cowan in order to determine if they altered his opinion regarding causation. He noted that, if Cowan stated that the March 2003 back pain was the source of the back pain, it would greatly assist the defense.
On April 13, 2007, Attorney Anderson, having received Cowan’s addendum of March 8, wrote to Hall advising him that Cowan’s opinion would not assist the defense. Noting that Cowan would testify that Rivera’s condition was asymptomatic prior to the accident, he expected that Cowan would testify that the *477 accident had resulted Rivera’s condition becoming symptomatic. He correctly noted that a judge would instruct the jury that, if the defendant aggravated an underlying condition, he would be responsible for the original trauma and the aggravation. As a result, Anderson concluded that Cowan’s report would actually assist the plaintiff. Attorney Anderson suggested that Hall find another doctor to comment on the issue of causation.
On April 19, 2007, Attorney Anderson again wrote to Hall again advising Cowan’s report would not assist the defense and noting that if a juiy believed that Rivera’s back condition was asymptomatic before the accident, but became symptomatic thereafter, it would likely return a substantial verdict.
The following day Attorney Anderson again wrote to Hall, informing him that he had received Dr. Anderson’s report of Februaiy 2007 opining that the plaintiff suffered from failed back syndrome and persistent radiculopathy, and that his prognosis was fair. The report also noted that Rivera was at maximum medical improvement, that his injuries were related to the accident, and that he had a 20% impairment of the person due to his back problems.
Attorney Anderson also informed Hall that he had received a vocational assessment report authored by one Paul Blatchford (Blatchford). Attorney Anderson noted that Blatchford had administered an achievement test to Rivera and that in reading, writing, and arithmetic he tested in the lower 5% of those tested. He also noted that Rivera could not complete a dexterity test due to back pain. Blatchford opined that due to Rivera’s injuries and poor residual skills, he could not work again.
Attorney Anderson further noted that Rivera had no prior record of workers’ compensation claims, motor vehicle accidents, or other injuries.
On May 18, 2007, Alekman sent a 93A demand letter to Hall noting that he had made an earlier demand of the full policy limits of $1 million but had received no offer. In the 93A demand letter Alekman noted that Rivera was totally disabled with a 20% whole body impairment and had incurred $296,000.00 in medical bills. Rather than demand a specific sum, Alekman requested that Commerce tender a reasonable offer.
In late May, several days before the discovery deadline, Hall met with other representatives of Commerce to discuss future strategy and to evaluate the claim. Hall evaluated the claim as having a range of value of between $326,791.00 and $1,325,880.00. During that meeting it was decided that additional surveillance would be conducted and that Hall would request authority to extend an offer of settlement of $330,000.00.[2] In June 2007, Hall responded to the demand letter, denying any unfair settlement practices and offering $340,000.00.
In formulating his evaluation, and in responding to Alekman, Hall relied heavily on Cowan’s report and addendums and, as a result, apportioned 50% of Rivera’s medical bills to the accident and 50% to the degenerative disc disease. Hall noted that Commerce had logged in $175,000.00 in medical expenses as opposed to the $296,321.97 claimed by Rivera.
Hall rejected Dr. Anderson’s opinion of a 20% whole body impairment and relied entirely on Cowan’s opinion of a 13% whole body impairment. Hall argued that Cowan, whose identity was not disclosed to Alekman, attributed 50% of Rivera’s disability to the accident and 50% to the preexisting degenerative condition.[3] Giving the edge to Commerce, Hall attributed 6% of Rivera’s disability to the accident and 7% to the degenerative disc disease.
In formulating his offer of settlement Hall completely ignored Cowan’s finding that Rivera was asymptomatic prior to the accident and his own counsel’s opinion that Cowan’s opinion was likely to be favorable to the plaintiff. Hall also repeatedly ignored Attorney Anderson’s requests to send the Northgate records to Cowan in order to see if it changed his opinion of causation.
The initial offer was soon rejected and thereafter Hall decided to conduct additional surveillance of Rivera and now heeding Attorney Anderson’s advice, sent the medical records to Dr. Muriel Schwartz for a record review.
A pre-trial conference was held in September 2007. Cowan was not listed as an expert witness in the pre-trial conference report.
On October 9, 2007, Attorney Anderson wrote Hall to inform him that he had been provided medical bills totaling $308,400.00.
Hall completed a second evaluation of the claim in January 2008 and thereafter, in March, increased the offer to $640,000.00, which was also rejected. In late March, Attorney Anderson on behalf of Mutti, wrote a letter to Commerce demanding that it settle the claim within the policy limits.
On March 31, 2008, Commerce received a second 93A demand letter from Alekman. In this letter he rejected the $640,000.00 offer and increased his demand to $2,500,000.00.
On April 15, 2008, Commerce increased its offer to $700,000.00. This offer of settlement was likewise rejected.
On May 6, 2008, a final offer was extended in the amount of $1,000,000.00 which was accepted two days later.
DISCUSSION
General Laws c. 93A, §2(a), inserted by St. 1967, c. 813, §1, makes it unlawful to engage in ‘ju]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.” *478 Section 9(1) of G.L.c. 93A, as amended through St. 1979, c. 406, §1, provides a cause of action for “any person whose rights are affected by another person violating the provisions of [G.L.c. 176D, §3(9)].” General Laws c. 176D, §3, inserted by St. 1972, c. 543, §1, bans “unfair or deceptive acts or practices in the business of insurance,” which include “unfair claim settlement practice[s].” G.L.c. 176D, §3(9). “Those claiming injury by virtue of an insurance practice prohibited by G.L.c. 176D, §3(9)(f), may sue under G.L.c. 93A.” Bolden v. O’Connor Cafe of Worcester, Inc., 50 Mass.App.Ct. 56, 59 n.8 (2000), and cases cited.
General Laws c. 176D, §3(9), sets forth the acts and omissions comprising “unfair claim settlement practice[s]” under §3. As pertinent here, c 176D provides that an insurer will be liable when it refuses to pay claims “without conducting a reasonable investigation based upon all available information,” in violation of G.L.c. 176D, §3(9)(d), and failure “to effectuate prompt, fair and equitable settlement! ]” of a claim “in which liability ha[d] become reasonably clear,” in violation of G.L.c. 176D, §3(9)(fj. With respect to claimants, it was “enacted to encourage the settlement of insurance claims and discourage insurers from forcing claimants into unnecessary litigation to obtain relief." Clegg v. Butler, 424 Mass. at 419. See Hopkins v. Liberty Mut. Ins. Co., 434 Mass. 556, 562 (2001) (purpose of G.L.c. 176D, §3, is to “remedy a host of possible violations in the insurance industry and to subject insurers committing violations to the remedies available to an injured party under G.L.c. 93A”). G.Lc. 176D, §3(9)(f) in particular, aims to “deal with the conduct of some insurers that stymied those with bona fide claims from obtaining fair settlements in a reasonably prompt time.” Hopkins v. Liberty Mut. Ins. Co., supra at 562.
Rivera here contends that Commerce contravened the statute by two different but related means. His primary contention is that Commerce failed, by its failure to conduct a reasonable investigation, to offer a reasonable settlement commensurate with his damages from the accident, once the liability of its insured, Mutti, had become reasonably clear.
Any violation of the terms of that statute would amount to a violation of c. 93A, the consumer protection act, which bars unfair and deceptive acts or practices in trade or commerce. Hopkins v. Liberty Mutual Insurance Co., 434 Mass. 556, 564 (2001). The interplay between these two statutes subjects an entity which violates the provisions of c. 176D to double or treble damages and the assessment of reasonable attorneys fees as provided for in c. 93A. Kapp v. Arbella Mutual Insurance Co., 426 Mass. 683, 684 (1998).
Whether liability for a claim is “reasonably clear” calls for the application of an objective standard of inquiry into the facts of the claim at issue and into the pertinent law. Demeo v. State Farm Insurance Co., 38 Mass.App.Ct. 955, 956 (1995). The objective test for determining liability is whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff. Id. at 956-57.
Evaluating possible liability under the statute encompasses the question of both fault and damages. Clegg v. Butler, 424 Mass. 413, 421-22 (1997). Insurers are entitled to the time to undertake a thorough investigation of the claim, and they are not to be penalized for delay which is occasioned by further investigation conducted in good faith where liability is not clear. Id. Finally it is significant to note that, notwithstanding the obligation which an insurer bears under the provisions of c. 176D to ensure that claimants are treated fairly, it is not to be second-guessed for a legitimate and good faith belief concerning a claim which later turns out not to have been true, as a good faith but mistaken belief as to the merits of a claim will not furnish a basis for insurer liability. See O’Leary-Allison v. Metropolitan Property & Casualty Co., 52 Mass.App.Ct. 214, 218 (2001).
Furthermore, where liability is clear but there is a good faith dispute as to the extent of the damages, an insurer, while it is obligated to make what it believes to be a reasonable offer, is not obligated to immediately proffer its final or best offer. Bobick v. United States Fidelity and Guarantee Trust, 439 Mass. 652 at 662 (2003). Negotiating a settlement, particularly when the damages are unliquidated, is, to an extent, a legitimate bargaining process. The statute [G.L.c. 176D, §3(9)] does not call for [a] defendant’s final offer, but only one within the scope of reasonableness.
The focus of the inquiry is whether or not Commerce, in response to a request for a reasonable offer of settlement by Rivera did so when, on June 4, 2007, it offered $340,000.00 in fair settlement of the plaintiffs claims I find that it did not and that its failure to do so was caused by Hall’s failure to conduct a reasonable investigation into Rivera’s claim.
A reasonable investigation required Hall to inquire of Cowan, his chosen expert, whether or not Rivera’s underlying asymptomatic degenerative disc disease was aggravated by the accident. This was clearly recognized by Atty. Anderson who repeatedly requested Hall do so.
I find that Hall ignored Atty. Anderson’s requests, not out of neglect of duty, but purposefully and strategically, because he suspected what Cowan’s answer to Atty. Anderson’s inquiry would likely be and did not want to hear it. Hall was well aware that while Rivera had complained of generalized back pain months before the accident, he made no such complaints during two doctor’s visits preceding the accident. He was also well aware that any pain Rivera might have suffered prior to the accident did not prevent him from maintaining full-time employment as a machine operator. Hall also knew that the collision which caused Rivera’s injuries was no minor fender bender but that he had *479 been hit head on by a dump truck. As a result I find that Hall anticipated that Cowan would, if provided all the facts, opine that Rivera’s underlying condition was aggravated by the accident.
Hall decided the better course of action was to “see no evil, hear no evil and speak no evil.”[4] Rather than conduct a reasonable investigation as required by law, Hall was quite prepared to cherry-pick his facts, ignore the unfavorable aspects of Cowan’s report and his own counsel’s requests for a further investigation, in order to justify the lowest offer he could. In essence Hall was willing to chance a deliberate violation of the statute, in the hope that the plaintiffs financial straits would compel them to accept an offer of settlement far less than reasonably commensurate with Rivera’s injuries.
As of June 4, 2007, Hall had evaluated the claim as having a range of value between $326,731.00 on the low end to $1,325,880.00 on the high end. The low end was based on Hall’s determination that Rivera’s degenerative disc disease was not aggravated by the accident, which determination he was not only unqualified to make but steadfast in his refusal to investigate.[5] Based on Hall’s own range of values, I find that a reasonable offer of settlement would have been $1,000,000.00.
DAMAGES
“When an insurer wrongfully withholds funds from a claimant, it is depriving that claimant of the use of those funds.” Clegg v. Butler, 424 Mass. 413, 419 (1997). A claimant’s loss of use of money that should have been obtained through settlement constitutes “actual damages” under G.L.c. 93A, §9(3), and is applicable in this case. See Shwartz v. Rose, 418 Mass. 41, 47 (1994). Rivera lost the use of the funds eventually obtained through settlement for the period between June 4, 2007, the time at which Commerce failed to make a reasonable offer of settlement due to its failure to conduct a reasonable investigation, through the date of its final offer of settlement on May 6, 2008, a period of approximately eleven months.
I find that such funds, $660,000.00, could have been invested for this period in low risk, conservative investments and return a rate of 6% per annum. See Bertassi v. Allstate Ins. Co., 402 Mass. 366, 373 (1988) (damages under G.L.c. 93A, §9(3) consists of “interest at a fair rate on the settlement or award amount).” The loss to Rivera for the loss of use of these funds for that period is $36,300.00. This amount represents the actual damages sustained, i e., the losses which were the foreseeable consequence of Commerce’s unfair conduct after it had sufficient information to offer a reasonable settlement. Cohen v. Liberty Mut. Ins. Co., 41 Mass.App.Ct., 748, 755 (1996), and the date of the final offer.
(1)For the reasons set forth above, this Court finds that Commerce Insurance Company did violate its duty as a liability insurer under G.L.c. 176D, §3(9)(d), by refusing to pay claims “without conducting a reasonable investigation based upon all available information,” and under G.L.c. 176D, §3(9)(f) by its failure “to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.”
(2) This Court finds that the violations set forth above were knowing violations of G.L.c. 93A and that trebling the amount of actual damages is an appropriate award for such violations. Therefore, the Court awards the plaintiffs the amount of $108,900.00 in actual and punitive damages.
(3) This Court finds, under G.L.c. 93A, §9(4), that Commerce Insurance Company will also pay to the plaintiffs the reasonable attorneys fees and costs incurred in prosecuting this action. Plaintiffs will serve their application for reasonable attorneys fees and costs, supported by appropriate affidavits and documentation, no later than twenty (20) days from the date of this decision. Commerce, no later than ten (10) days following the filing by plaintiffs of the application, will serve any opposition thereto. A hearing regarding the application for attorneys fees will be scheduled thereafter.

initially, Hall made no allotment for the consortium claims, but after meeting with his manager, it was decided that $10,000 would be added for the loss of consortium claim.

Hall made no effort to sort through the medical bills to identify which bills were reasonably related to the accident or the degenerative disc disease.

An ancient Japanese proverb depicted by the three monkeys, Mizaru, Etkazaru and Iwazaru.

This determination I note, was not shared by his supervisor Susan Bums. In a memo dated June 4, 2007, Burns wrote, “I think it is more likely than not that this ‘ax’ [accident] did cause the need for the surgeries and the e-stim.”